# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  8:23-MJ-00228 |
| 10 Corporate Park, Suite 330, Irvine, California 92606 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Taylor Greig
_____
*Applicant's signature*

Taylor Greig, Special Agent (FBI)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Santa Ana, CA_____

_____
*Judge's signature*

Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jennifer Waier (714) 338-3550

**AFFIDAVIT**

I, Taylor Greig, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since April 10, 2022. I am currently assigned to the Ventura Resident Agency of the Los Angeles Division of the FBI.  I am currently assigned to a squad that investigates criminal matters, to include white-collar crime violations.  I have an undergraduate degree in Business Administration with a concentration in Finance from Seattle Pacific University.  I have a master's degree in Development Management from London School of Economics and Political Science. Prior to working for the FBI, I consulted with individuals and entrepreneurs on debt reduction and business financial growth.  I have received 18 weeks of instruction in the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.

2.    In the course of my employment with the FBI, I have investigated a variety of violations, including public corruption, money laundering, mail and wire fraud, and drug trafficking.  I have participated in numerous aspects of criminal investigations, including the interviewing of witnesses, physical surveillance, utilization of confidential informants, consensually monitored telephone conversations, the execution of search warrants, and the arrest of individuals wanted for various violations of federal law.

3.    As a SA, I have received instructions in the identification, collection, and preservation of evidence, photography, latent print collection, and crime-scene investigations.  I have also completed hundreds of hours of

1

criminal investigations, including compiling information; interviewing victims, witnesses, and suspects; and collecting evidence to support the filing of criminal complaints and search warrants.

4.     During the course of my investigations, I have reviewed various forms of evidence including telephone call detail records, bank records, invoices, photographs, recorded telephone calls and other miscellaneous financial documents. Through my training, education, and experience, I have become familiar with a variety of money laundering and fraud schemes.

5.     In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior special agents and financial investigators with years of experience in various criminal investigations including, but not limited to mail fraud, wire fraud, cryptocurrency, and money laundering.  Throughout my experiences with these senior agents, I have received guidance, training, and hands-on experience in various investigative techniques including, but not limited to, interviewing, surveillance, financial analysis, and other investigative techniques, including with respect to the identification and tracing of illicit proceeds.

## II. PURPOSE OF AFFIDAVIT

6.     This affidavit is made in support of an application for warrants to search: (1) the residence of KE ZHANG ("ZHANG""), located at 20 Robins Tree Lane, Irvine, California 92602 ("SUBJECT PREMISES 1"), as described in Attachment A-1; (2) the business of KE ZHANG, known as KE & ASSOCIATES, CONSULTING INC. ("KE & ASSOCIATES"), located at 10 Corporate Park, Suite 330, Irvine, California 92606 ("SUBJECT PREMISES 2"), as described in Attachment A-2; (3) a white Mercedes-Benz, California license plate number 8NCU620, registered to KE AND ASSOCIATES CONSULTING INC, or KE ZHANG and SUBJECT PREMISES 2

(the "SUBJECT VEHICLE"), as described in Attachment A-3; (4) the person of ZHANG, as described in Attachment A-4; and (5) the person of YANMING WANG ("WANG"), aka "Yolanda," as described in Attachment A-5, for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1344 (Bank Fraud); 18 U.S.C. § 1343 (Wire Fraud); and 18 U.S.C. § 1956 (Money Laundering) (collectively, the "SUBJECT OFFENSES"), which are set forth in Attachment B. Attachments A- 1, A-2, A-3, A-4, A-5, and B are hereby incorporated by reference.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of bank records, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

8.    This affidavit is seeking a warrant to search SUBJECT PREMISES 1 and 2, the SUBJECT VEHICLE, and the persons of ZHANG and WANG. There is reason to believe that ZHANG and WANG are involved in an ongoing scheme in which ZHANG and WANG, through KE & ASSOCIATES, incorporate companies in the United States and establish bank accounts for their clients located in the United States and China, who then use the newly formed companies and the bank accounts for unlawful purposes.

9.    From approximately 2017 until at least March 2023, ZHANG, the owner of KE & ASSOCIATES, used the names of family members and others (herein referred to as "Straw Openers") to file Articles of Incorporation for new Limited Liability

3

Corporations ("LLC") in various states, including California,
Delaware, and Nevada.  ZHANG then obtained Employer
Identification Numbers ("EINs") from the Internal Revenue
Service ("IRS").  The information ZHANG supplied to the IRS was
false.  I reviewed public source databases, Secretary of State
records, and FinCen records and learned that ZHANG incorporated
at least 57 corporations using SUBJECT PREMISES 2 as the
address.  The EIN and corporate documents were then used to
establish US bank accounts for foreign nationals who used these
bank accounts to conceal the proceeds of illegal drug sales and
wire fraud schemes.

10.  ZHANG contacted bank employees at banking
institutions to include Bank of America ("BofA"), who assisted
with opening business bank accounts using the "front company"
corporate documents.  The bank employees opened bank accounts
for non-resident alien ("NRA") individuals and businesses in
violation of federal banking laws and bank policy.  The accounts
were used to move tens of millions of dollars from China and
Hong Kong.

11.  In 2023, I participated in two undercover operations
where an Undercover Employee ("UCE") met with ZHANG and
requested assistance in incorporating a business for the
purposes of establishing a bank account.  The UCE informed ZHANG
that the true nature of his/her business was drug sales and that
he/she needed a business bank account to launder drug proceeds.
During the course of the undercover operation, ZHANG informed
the UCE how to launder his/her illicit proceeds.  ZHANG
instructed the UCE to meet with his assistant, WANG, to complete
the registration and to collect payment for his services.  The
UCE named the business KDAY Management Inc.

12.  On March 10, 2023, ZHANG successfully incorporated KDAY Management Inc. with the knowledge that the true nature of the business was drug trafficking and that those documents would be used to establish a business bank account to launder illegal proceeds.

13.  ZHANG has previously demonstrated his willingness to incorporate businesses that were used as front companies for drug trafficking.  On or about October 21, 2019, ZHANG incorporated two businesses, identified as RAINTIGER INC., ("RAINTIGER") and SKYSTELLAR INC., ("SKYSTELLAR"), both which I believe are front companies designed to launder cash generated from drug proceeds.  SKYSTELLAR and RAINTIGER were both registered on the same day and used the same address of 116 Meander, Irvine, California 92620 ("the Meander address").  The registering agent for both companies was KE & ASSOCIATES. RAINTIGER and SKYSTELLAR had BofA business accounts opened on October 23, 2019.  Each account received large cash deposits from F-1 student visa holders and known individuals associated with narcotics shipments.  Many of the deposits into RAINTIGER and SKYSTELLAR's business bank accounts were large cash deposits and the funds were subsequently transferred out of the business bank accounts.  RAINTIGER's BofA account ending in 2171 ("BoA 2171") was closed on February 29, 2020, approximately four months after opening.  SKYSTELLAR's BofA account ending in 2155 ("BofA 2155") was closed on March 31, 2020, around five months after opening.

14.  Based on my investigation, I believe that SUBJECT PREMISES 1 is ZHANG's principal residence and SUBJECT PREMISES 2 is ZHANG's principal place of business.  Based on physical surveillance of SUBJECT PREMISES 2, I believe that the SUBJECT VEHICLE is the primary vehicle ZHANG uses to travel between SUBJECT PREMISES 1 and 2.  For this reason, I believe that

documents and records related to ZHANG's and WANG's involvement
in the SUBJECT OFFENSES will be found at SUBJECT PREMISES 1 and
2, the SUBJECT VEHICLE, as well as the persons of ZHANG and
WANG.

## IV. STATEMENT OF PROBABLE CAUSE

**A.   KE & ASSOCIATES - ZHANG's Business**

15.   ZHANG is the owner and operator of KE & ASSOCIATES, a
company located at SUBJECT PREMISES 2.  On January 31, 2023, I
accessed the California Secretary of State website[1] and queried
records for the business name, KE & ASSOCIATES CONSULTING INC.
The records showed the following:

a.   KE & ASSOCIATES, Secretary State File Number
C4216803, was incorporated on December 3, 2018.  The Articles of
Incorporation for KE & ASSOCIATES identified ZHANG as the
incorporator.

b.   A Statement of Information was filed on December
6, 2022, for KE & ASSOCIATES, in which ZHANG was listed as Chief
Executive Officer ("CEO"), Chief Financial Officer, and
Secretary, and identified SUBJECT PREMISE 2 as the address.

16.   On March 30, 2023, I accessed the company webpage for
KE & ASSOCIATES, identified as kecpausa.com, and learned the
following:

a.   KE & ASSOCIATES has four locations listed on
kecpausa.com.  The Irvine Branch is located at SUBJECT PREMISES
2.  Additional branch locations are in San Jose, California, Las
Vegas, Nevada, and Qingdao, Shandong, China.

b.   ZHANG is listed as founder and CEO. Included on
the website was a photograph of ZHANG.  I compared the
photograph of ZHANG on the website with ZHANG's California DMV
photograph and they depicted the same person.

---

[1] The website was identified as bizfileonline.sos.ca.gov/search/business.

c.   WANG was listed as an Enrolled Agent, Payroll and Tax Advisor.  Included on the website was a photograph of WANG.  I compared the photograph of WANG with a California DMV photograph of WANG and believe it is the same person.

**B.   ZHANG's Association with Bank Employee COURTNEY SHAN**

17.   I learned from agents from the Department of Homeland Security, Homeland Security Investigations ("DHS-HSI") involved in this investigation that ZHANG and his associate, WANG, were working with at least three bank employees who were subsequently accused of improperly opening bank accounts for ZHANG's clients. Homeland Security Investigations ("HSI") investigators served two seizure warrants and seized the funds of 41 banks accounts that were established by these bank employees.  Specifically, on or about December 3, 2021, HSI SA Melanie Aguilar obtained seizure warrant 2-21-MJ-5478, signed by the Honorable Patricia Donahue, that authorized the seizure of subject funds from 15 BofA[2] accounts improperly opened by BofA employee COURNTEY SHAN ("SHAN").  I reviewed the seizure warrant affidavit and learned the following:

a.   On or about September 2021, Clayton Macy, a member of the Internal Enterprise Investigations ("IEI") unit at BofA contacted SA Aguilar regarding potential illegal activity that BofA believed had been committed by BofA employee SHAN.  IEI investigators believed SHAN improperly opened at least 44 BofA bank accounts, each of which appeared to be opened using a small number of addresses, repetitive account signers, and/or identified beneficial owners.  The IEI investigators believe these suspect accounts belonged to or were controlled by ZHANG.

---

[2] BofA is a federally insured financial institution within the meaning of federal law

SHAN opened these BofA accounts in violation of federal
regulations and BofA policies implemented to ensure compliance
with those same laws.  SHAN is no longer employed at the BofA
branch, which is located within this district.

b.   According to the seizure affidavit, the subject
funds represented or were traceable to proceeds of a fraud
scheme where millions of dollars were transferred from China and
Hong Kong into the subject accounts and the U.S. financial
system, while evading BofA's Anti-Money Laundering policies and
Customer Identification Program (the "AML/CIP Policies").
Specifically, ZHANG and/or his employees appeared to have
substituted themselves on account opening documentation provided
to SHAN so that accounts could be opened on behalf of foreign
nationals who were not present in the United States.  SHAN
opened these accounts without verifying the identities of the
purported account openers.

c.   Of the 44 identified accounts, SHAN used just two
addresses, SUBJECT PREMISES 2 and 145 E. Duarte Road, Arcadia,
California 91006 ("the Arcadia address") as the address of
record for the subject accounts.  In doing so, SHAN appeared to
have been acting as a conspirator as part of a broader fraud
scheme, the object of which was to open and use U.S. bank
accounts to illegally funnel money into the United States from
Hong Kong and China while evading restrictions on the use of
domestic bank accounts by unknown foreign parties.

d.   IEI investigators identified a pattern where
checking accounts were opened using Straw Openers to sign
signature cards on behalf of foreign nationals who were not
present during the account opening activity.

e.   Of the 44 accounts opened by SHAN, only 15 business
accounts had funds at the time the seizure warrant was executed.
The total amount seized was $642,277.93.  There were only 6

8

different beneficial owners identified. In some instances,
numerous accounts were opened by the same purported beneficial
owner for different companies on the same day.  For example,
four of the subject accounts were opened on the same day using
the same beneficial owner but for different business accounts.

18.   I reviewed an HSI report dated February 17, 2023,
documenting an interview with HONGPENG YOU ("YOU") regarding Hi
Morrow, Inc., a Chinese-based company, whose funds were seized
pursuant to the above-mentioned court order and learned the
following:

a.   The identified signer and manager for the Hi Morrow,
Inc., business bank account was listed as XIUYING LIN ("X. LIN")[3]
and opened by SHAN on April 28, 2020.  YOU was listed as the
registered agent of the business with a physical address of 4255
S. Buckley Road, Aurora, Colorado.  The mailing address provided
to the bank at the time of the account opening was SUBJECT
PREMISES 2.

b.   YOU stated that he was currently in China and had
not been to the United States since 2019.  In August 2019, YOU
traveled to the United States for 7-8 days with his wife.  YOU
stated that while he was staying in Irvine, California, he went
to the BofA branch closest to his rental house and met with
SHAN, who opened up an individual account for YOU.  YOU told
SHAN that he needed to create a United States business.  SHAN
provided YOU ZHANG's accounting firm's contact information,
which SHAN said could assist YOU in creating a United States
business for him, as well as a business bank account.  SHAN
provided YOU with the WeChat information for KE & ASSOCIATES.

c.   Approximately three months afterwards, YOU reached
out to ZHANG via WeChat and asked for his assistance in creating

---

[3] I learned from SA Aguilar, who reviewed ZHANG's immigration file, that X.
LIN is ZHANG's mother-in-law.

a United States business.  YOU stated that KE & ASSOCIATES
created a United States business and opened a business bank
account for him at BofA with the same teller, SHAN.  YOU stated
that he was in China when the bank account was created, and that
ZHANG knew that.  SA Aguilar asked YOU who X. LIN was since she
was listed as the signer on the bank account and manager of the
business. YOU stated that she is employed by KE & ASSOCIATES and
was told by ZHANG that she would be put on the bank account in
order to be able to open up the bank account.

19.   I reviewed translations of screenshots that captured
the WeChat conversations between YOU, ZHANG and SHAN and learned
the following:

a.   On April 22, 2020, YOU asked ZHANG if he would be
the one finding a signer for a BofA business bank account for
YOU's company.  ZHANG affirmed.

b.   On April 23, 2020, YOU stated that he transferred a
total of $1,100 USD to ZHANG, including a $500 USD service fee
for opening a bank account.

c.   On April 29, 2020, WANG sent a pdf which confirmed
that the business BofA bank account had been opened.

20.   I reviewed an HSI report dated February 17, 2023,
regarding an interview of PENG YU ("YU"), who reported to be a
friend of the founder and owner of Fashion Arrow Creations,
TIANMING ZHOU ("ZHOU") and learned the following:

a.   Fashion Arrow Creations was one of the 15 bank
accounts that were seized pursuant to the above-mentioned court
order.  YU stated that ZHOU lives in China and has never been to
the United States.  YU stated that his primary role in the
business was to help create the company and bank account in the
United States.

b.   YU stated that he saw an ad on YouTube advertising a
Certified Public Accountant ("CPA") firm in Irvine, California.

10

He stated that he initially reached out to the accountant, who he later identified as "ZHANG" (NFI), via WeChat, and then met him in his office in Irvine, California.  He stated that the CPA firm helped him form a company.  YU put the CPA owner in contact with the ZHOU in China.

c.  YU stated that the CPA opened a United States bank account for the business.  He was unsure how he did this as YU or ZHOU were not present at the bank during the opening of the account.  SA Aguilar asked YU to identify X. LIN, who was listed as the signer on the bank account information.  YU did not know who that was.  YU stated that the CPA took care of everything related to the opening of the bank account and he did not think that X. LIN was associated to the business.

21.  I reviewed a Secretary of State filing for Fashion Arrow, Inc. and, according to the initial filing on March 16, 2020, the mailing address was listed as SUBJECT PREMISES 2.  The statement of information filed on September 8, 2021, listed the business address as 92 Corporate Park, Suite C204, Irvine, California 92606 ("the Corporate Park mailbox").

22.  As a result of the seizure, a petition package was submitted to the Department of Justice related to the funds seized from Fashion Arrow Creation's bank account.  Included in the petition package was a typed letter from KE & ASSOCIATES dated January 7, 2022, indicating that KE & ASSOCIATES is not a DBA for Fashion Arrow Creations Inc.  The letter stated that KE & ASSOCIATES is an accounting firm that provided incorporation and tax filing services and that they did not engage in any of its operating activities.

C.   **ZHANG's Association with Bank Employee ZIBO TANG**

23.  BofA also identified another BofA employee, ZIBO TANG, who fraudulently opened business bank accounts in the names of non-resident aliens who were not present in a BofA branch or the

11

United States when the accounts were opened.  TANG opened 39
accounts, each of which appeared to be funded by checks from KE
& ASSOCIATES.  Emails originating from KE & ASSOCIATES, via the
email accounts taxes@kecpausa.com and acctinfo@kecpausa.com,
were found in TANG's BofA email accounts, which were obtained by
federal investigators.  The email authors appeared to be ZHANG
and WANG.

24.  BofA determined that TANG had compromised BofA
customer account information through fraud, falsifying bank
records, and opening accounts in the names of individuals who
were not present in the branch, as required by BofA's AML/CIP
Policies and 31 CFR § 1020.220 (previously 31 CFR 1020.121).

25.  I reviewed an affidavit for federal seizure warrant
number 2:21-MJ-3681 signed by the Honorable Steven Kim on August
9, 2021, where federal investigators seized 26 bank accounts
opened by TANG at BofA.  This resulted in a seizure of
$407,030.28.  TANG is a former employee of BofA in this
district.  Between at least June and December of 2020, TANG used
his position as a personal banker at BofA to open more than 80
bank accounts at BofA in violation of the AML/CIP Policies using
copies of Chinese passports (both real and potentially
fraudulent).  TANG opened each of these accounts using one of
three addresses and the vast majority were opened using SUBJECT
PREMISES 2 as the address.

26.  According to the affidavit, on January 28, 2021, TANG
was interviewed by IEI investigators.  TANG admitted that he
opened business NRA accounts for Chinese nationals who were not
present in the United States, but who had instead sent
representatives from KE & ASSOCIATES into the branch to open
business bank accounts for these Chinese nationals.

27.  TANG admitted that when opening these accounts,

TANG would use the personal information of KE & ASSOCIATES
representatives to open the account, knowing that the
representative was not actually associated with the company
seeking to open the account.  TANG intentionally failed to enter
the actual business owner or representative's personal
information into BofA's system.

**D.  The January 25, 2023 Undercover Operation**

28.  On January 12, 2023, at approximately 1:03 p.m., a UCE
contacted ZHANG via WeChat and requested his assistance in
setting up a business.  The WeChat handle used to communicate
with ZHANG was "weibochrischang," which was identified from an
advertisement posted on www.chineseinla.com.  I reviewed the
WeChat conversations and observed ZHANG's photograph from his
business website associated with the "weibochrischang" handle.
The UCE asked if ZHANG accepted "walk ins."  ZHANG asked if it
was "for business or individual?"  The UCE responded, "Is
business mostly.  Kind of important for my boss."  ZHANG
responded, providing his office hours and availability.  On
January 20, 2023, at approximately 12:18 p.m., the UCE asked if
ZHANG was available for an appointment on January 25, 2023, at
10:00 a.m.  ZHANG confirmed and provided SUBJECT PREMISES 2 as
his location.

29.  On January 25, 2023, at approximately 10:03 a.m., SA
Aguilar observed ZHANG driving in the SUBJECT VEHICLE, arriving
at SUBJECT PREMISES 2.  At approximately 10:25 a.m., the UCE
entered SUBJECT PREMISES 2 and met with ZHANG.  The meeting was
recorded.  From reviewing the audio recording and a transcript
of the recording, and speaking with the UCE, I learned the
following:

a.   The UCE told ZHANG he/she wanted to open a business.
ZHANG asked who the business owner was.  The UCE said he/she did
not want to say because he/she gave him/her money to come here

and would account for them.  The UCE explained he/she works at a
dispensary, but that "they" have other businesses too, that it
is a cash business.  ZHANG asked if it is an "American business"
and the UCE affirmed.  The UCE further explained that he/she
doesn't know the business and that he/she just collects the
money.  ZHANG then asked if they are opening US bank accounts.
The UCE affirmed.  ZHANG explained that if the UCE will be the
signer, he recommended opening an account with Chase bank.  The
UCE asked which bank was better because "it's a lot of money."
ZHANG stated, "Chase would be better…if you have some money
laundering."  ZHANG stated he didn't have anybody, but further
explained that it is best for money transfers.

     b.   ZHANG then recommended incorporating the business in
Delaware because he/she would not have to pay state sales taxes.
The UCE told ZHANG that he/she was helping out and that he/she
had cash and explained that he/she did not want to go to the
bank.  ZHANG confirmed that if the UCE did not have a signer for
the business account, the only choice would be East West Bank.
ZHANG then said that the UCE needed to "find out anyone, uh,
that can have [unintelligible] with you."

     c.   The UCE explained, the money, "it's ecstasy money,
it's drug money," which is why they need the business, but the
UCE didn't want his/her "name in the bank."  The UCE asked, if
he/she needed paperwork because he/she doesn't want his/her
name, and his/her boss doesn't want the UCE's name on the
account either.  ZHANG explained that the UCE needed to have a
"real person" and suggested choosing another person like a
friend or someone in China or Hong Kong.  UCE asked if he/she
could paid additional money to ZHANG, if ZHANG found a signer
for the UCE.  ZHANG explained to have a friend sign it for
him/her.  The UCE asked if ZHANG would help him/her start the
business.  ZHANG stated, "Yeah. I just, uh, have to, uh,

incorporate the business that's going to our office…"  ZHANG
then discusses A-M-L and "anti-money laundering."  The UCE
explained he/she does not know what that means.  The UCE states
it is "not like a real business."  ZHANG explains AML checks
will look for money transferred quickly out of accounts.  While
explaining the anti-money laundering laws in place by the United
States government, ZHANG drew a diagram on a white board
explaining the laundering process and specifically pointed out
how important it is to properly launder the funds to avoid anti-
money laundering laws.

   d. ZHANG told the UCE that the cost to create the
business and assist with opening the bank account was $670 and
that it would cost $770 if the signer of the account did not
have a social security number.

  30. At approximately 10:49 am, ZHANG sent the UCE via
WeChat two forms for the UCE to fill out in order to establish a
corporation.  He also sent a text that said, "670+100" that I
know from my conversation with the UCE is the fee ZHANG charged
for incorporating a business plus his fee, for a total of $770.

  31. On February 2, 2023, the UCE asked for ZHANG's email
address.  ZHANG responded, taxes@kecpausa.com.  He then stated,
"please tell me by wechat when u sent email."  The UCE asked,
"Do I put any name on the business creation paper or do I use
the name of a friend who will open the bank account."  ZHANG
responded, "He will be at least one of the officers as a bank
account signer," "Officer means ceo,cfo,secretary, directors",
and "He will be any one of above positions."  The UCE asked,
"Can we use your office mailing address?  Or address of the
Delaware."  ZHANG responded, "sure, no problem."  The UCE asked,
"How much to create business?  We don't have ssn.  I can pay
cash."  ZHANG stated, "670+100."

  32. On February 2, 2023, ZHANG sent a WeChat group message

to the UCE along with ZHANG's employees, WANG, SARAH LUO, and
JENNIFER LU.  ZHANG instructed the UCE to "put the filled form
here when u r ready."  The UCE responded, "Yes thank you Mr
Zhang."  On February 14, 2023, the UCE sent a PDF form filled
out with the required information to the WeChat group chat.  The
PDF form contained information that was known to be false, to
include the nature of the business and the corporate officers.
Additionally, the UCE used KE & ASSOCIATE's mailing address,
identified as the Corporate Park mailbox.

33.  On February 21, 2023, the UCE sent a message to ZHANG
asking if he was in the office Thursday because he/she had some
questions.  ZHANG replied, "My Irvine office manager Yanming
will be there", followed by, "Sorry so busy in tax season, we
will need consulting fee for $300 per hour if you only ask
questions in tax season until 4/18/2023."[4]  The UCE asked, "Can
you do 30 minutes, I'll pay", "150", "300 no problem too."
ZHANG responded, "Okay but I won't be in Irvine until 2/27 next
Monday, my manager Yanming will be able to talk to u.  I will
come back next Tuesday."  The UCE responded, "Ok.  I'll talk to
your manager.  Does she understand what we talked about?"  ZHANG
replied, "sure."

E.    **The February 23, 2023 Undercover Operation**

34.  On February 23, 2023, at approximately 11:30 a.m., the
UCE went to SUBJECT PREMISES 2 and met with WANG, who the UCE
positively identified from WANG's photograph on the KE &
ASSOCIATES' website, as well as WANG's California Driver's
license.  The meeting was audio and video recorded.  After
reviewing the audio recording and speaking with the UCE, I
learned the following:

---

[4]  ZHANG is a certified public account and does run a tax
preparation business at K&E Associates.

a.   The UCE asked for "Yanming", and asked her if Mr. Zhang told her everything about the business.  The UCE told her he/she is opening up a company on behalf of someone, showed her the form he/she filled out and asked if they could talk privately somewhere.  They moved to ZHANG's office to talk. WANG stated that ZHANG was not there and would be back the following week.  The UCE stated that he/she was not very comfortable talking to WANG and asked if ZHANG explained everything to her about the UCE's business.  WANG suggested that they call ZHANG on the phone.  WANG called ZHANG using a cellular phone and put the phone on speaker so the UCE could hear him.  WANG pushed the phone towards the UCE so that she/he could hear him better, and the UCE was able to observe the telephone number that was used to call ZHANG.  The UCE recognized the voice to be ZHANG's voice.  The UCE wrote the phone number down in his/her notes as being 702-626-4688.[5]  WANG had ZHANG on speaker phone throughout the remainder of the meeting.

b.   The UCE asked ZHANG if he told WANG what his/her business was, and ZHANG laughed and stated that because the UCE has too much cash, he/she needs to deposit it.  The UCE asked what type of business the UCE should open, ZHANG indicated that he/she could open a restaurant or logistics business.  He stated the UCE will have to get an expensive permit and asked if the UCE wanted to open up a "real business."  The UCE stated he/she did not want to open a real business and that he/she has an "all cash business" resulting from cocaine and methamphetamine sales. WANG and ZHANG both said okay.

c.   WANG explained that some banks ask questions related to business operations so the UCE should choose a business that

---

[5] According to T-Mobile records, this phone is subscribed to KE & ASSOCIATE CONSULTING at SUBJECT PREMISES 2.

is familiar to the UCE.  The UCE then asked about a consulting business, and both ZHANG and WANG agreed.

d.   When the UCE asked if the bank will look at her/him for bringing in a lot of cash, ZHANG replied they [the bank] wouldn't if the UCE has agreement with them.  WANG stated that some banks are "really sensitive about large amounts of cash deposits."

e.   The UCE told them that he/she found a "friend" to open the bank account.  When asked where he/she should open up the account, ZHANG stated that he usually uses Chase but does not recommend the UCE going there if his/her "friend" has an individual account there.  ZHANG also indicated that the UCE could use Wells Fargo or East West Bank.

f.   The UCE asked ZHANG if ZHANG was going to help open the bank account, and ZHANG stated that for this contract, the UCE could open the account.  ZHANG stated that since the UCE was in America, the UCE could just walk into any bank and give them the corporation files and the bank will open a business bank account for the UCE.

g.   ZHANG told the UCE that it is better to keep the money in the account for six months to avoid the bank from closing it, which is why the signer should not have an individual account to prevent the bank from closing the individual account.

h.   Because ZHANG previously suggested that they open the business in Delaware, the UCE asked if he/she needed an actual address in Delaware.  WANG stated that it was fine if the UCE did not have an actual address in Delaware.  ZHANG told the UCE it was fine to use KE & ASSOCIATE's business address as the registered agent address and the principal office address.  WANG then told the UCE that they will use KE & ASSOCIATES's mailing address as the mailing address for the UCE's business.  WANG

18

provided the Corporate Park mailbox address.  WANG indicated
that it was a mailbox store where they had a PO Box, and that
the UCE could use that address to receive mail.  WANG stated
that if the UCE gets business mail there, WANG will reach out to
him/her and let him/her know.

i.  The UCE then showed WANG the paperwork that he/she
filled out to create the business and asked if he/she needed to
fill anything else out on it.  WANG looked at the paperwork and
asked if the UCE had the identification of the "friend" that was
identified on the form to verify that he/she is a real person.
The UCE indicated that he/she did not have it but would get it
for WANG and send via WeChat.

j.  WANG asked the UCE if he/she had a business phone
number, and the UCE stated that is it cocaine money and it is a
drug business so there is no business phone number.  WANG
affirmed and stated she will put down the UCE's phone number.
The UCE then asked WANG where she recommended he/she open an
account since it is a lot of cash.  WANG stated that they
usually recommend Chase but stated that she cannot guarantee
that there won't be any problems with the bank.  WANG stated
that it is up to the bank to decide if it is money laundering.
The UCE asked what money laundering was and WANG stated that if
you have large cash deposits and quickly withdraw the money, it
will trigger a red flag with the bank.  WANG agreed with ZHANG
that the UCE should not touch the money for six months.  WANG
also stated again to make sure the signer on the account does
not have a personal account with the bank.

k.  The UCE then asked what he/she owed them.  WANG told
her it was $920. The UCE gave Wang $920 as well as the pre-
filled US company registration information form.  The name of
the company listed was "KDay Management Inc."  WANG provided the
UCE with a receipt.  WANG told the UCE that the signer for the

19

business will have to sign the documents, which can be an e-signature when they get the documents back.  The UCE thanked ZHANG and WANG discontinued the call.  At approximately 12:10 p.m., the UCE exited the business.

**F.   ZHANG Incorporated KDAY Management, Inc.**

35.   On March 10, 2023, the UCE received an email originating from ZHANG at taxes@kecpausa.com.  The email subject line read, "KDay Management, Inc. has been completely incorporated."  The following attachments were included:

a.   Articles of Incorporation, filed on February 24, 2023, in the state of Delaware;

b.   EIN Number, identified as 92-2833176;

c.   Form 8821 Tax Information Authorization, listing KE ZHANG as an appointee.  The address ZHANG listed was 52 Strawberry Grove, Irvine, California[6] (the "Strawberry Grove address").  ZHANG asked for this form to be signed and returned;

d.   Bylaws of KDAY MANAGEMENT, INC;

e.   KDAY MANAGEMENT, INC. Minutes of the Directors Meeting (unsigned); and

f.   Form SS-4 Application for EIN.  The Designee listed was KE ZHANG at the Strawberry Grove address.  The mailing address was listed as the Corporate Park mailbox address.  The street address was listed as, "8 THE GREEN STE A, DOVER DE 19901", ("The Green address").  ZHANG asked for this form to be signed and returned.

36.   I reviewed the documents that were submitted to ZHANG and WANG and confirmed with the UCE that the Green address was never provided by the UCE to ZHANG or WANG.  I believe ZHANG knowingly provided false information on the IRS Form SS-4.

37.   I conducted an open-source query for the Green address

---

[6] 52 Strawberry Grove, Irvine, California is the address listed on ZHANG's California Driver's license.

and learned the following:

a.   The Green address is associated with a company called, "A Registered Agent, Inc."  I reviewed the website, www.delawareregisteredagent.com, and learned that the company offers services including but not limited to "Use of our local registered agent address on your formation filings."

b.   The company also offers to scan mail for clients a certain number of times per year.  The website states, "Point is: we're here in Delaware, so you don't have to be."

c. I believe ZHANG used the Green address as the UCE's mailing address for the purpose of establishing a fictitious business.

## G.   ZHANG Incorporated RAINTIGER and SKYSTELLAR

38.   On or about October 21, 2019, ZHANG incorporated two businesses, identified as RAINTIGER INC., ("RAINTIGER") and SKYSTELLAR INC., ("SKYSTELLAR"), both which I believe are front companies designed to launder cash generated from drug proceeds. SKYSTELLAR and RAINTIGER were both registered on the same day and used the Meander address as their address.

39.   On or about March 30, 2023, I accessed the California Secretary of State website and queried records for the business name, "RAINTIGER INC."  The records showed the following:

a.   The Articles of Incorporation for RAINTIGER was filed on October 17, 2019.  The address listed was the Meander address.  The registered agent was listed as KE & ASSOCIATES. SHUAI JIN is the signature.

b.   The Statement of Information for RAINTIGER was filed on October 21, 2019.  The California Corporate Filing Number is C4326065.  YUSHI LIU ("LIU") is listed as the CEO, Secretary, Chief Financial Officer, and Director of the company.  The description of type of business is "Trading".  ZHANG is listed as the person completing the form.

21

40.   On or about March 30, 2023, I accessed the California Secretary of State website and queried records for the business name, "SKYSTELLAR INC."   The records showed the following:

a.   The Articles of Incorporation for SKYSTELLAR was filed on October 17, 2019.   The address listed was the Meander address.   The registered agent was listed as KE & ASSOCIATES. SHUAI JIN was also listed as is the signature.

b.   The Statement of Information for RAINTIGER was filed on October 21, 2019.   The California Corporate Filing Number is C4326064.   KEYU SUN is listed as the CEO, Secretary, Chief Financial Officer, and Director of the company.   The description of type of business is "Trading".   ZHANG is listed as the person completing the form.

41.   On December 21, 2022, I reviewed the financial statements for bank accounts associated with RAINTIGER and SKYSTELLAR.   RAINTIGER's bank accounts consisted of BofA account ending in 2171 ("BofA 2171"), JP Morgan Chase accounts ending in 2631 and 6098 ("Chase 2631") and ("Chase 6098"), and Wells Fargo accounts ending in 1061 and 2506 ("WF 1061") and ("WF 2506"). SKYSTELLAR's bank account consisted of BofA ending in 2155 ("BofA 2155").   The bank statements showed the following:

a.   From October 23, 2019 to September 30, 2020, $9,547,545.40 was deposited into and was subsequently transferred, withdrawn, or wired out of RAINTIGER's above mentioned accounts.   Of the $9,547,545.40 deposits, $9,085,914 (95%) consisted of cash deposits.

b.   From October 23, 2019 to March 31, 2020, $2,197,634 was deposited into and subsequently transferred, withdrawn, or wired out of SKYSTELLAR's bank account BofA 2155.   Of the $2,197,634 deposits, $1,881,725 (86%) consisted of cash deposits into SKYSTELLAR's BofA 2155 account.

42.   On December 8, 2022, I reviewed FINCEN Currency

Transaction Reports ("CTRs") for bank accounts BofA 2171, Chase 2631, WF 1061, and BofA 2155. The CTRs showed the following:

a.   On November 15, 2019, an F-1 student visa holder named PUYAN HAO ("HAO"), date of birth ("DOB") August 9, 1989, made a cash deposit into RAINTIGER account BofA 2171 of $139,980 in East Point, Georgia.  RAINTIGER was classified as a "Fruit Import and Export Company".

b.  On November 15, 2019, HAO made a cash deposit into SKYSTELLAR account BofA 2155 of $139,915 in Buford, Georgia. SKYSTELLAR was classified as a "Stock Trading Company".

c.   On December 10, 2019, HAO made a cash deposit into RAINTIGER BofA 2171 of $374,000 in Atlanta, Georgia.  RAINTIGER was classified as a "Fruit Import and Export Company".

d.   On December 18, 2019, HAO made a cash deposit into RAINTIGER BofA 2171 of $199,600 in Saint Paul, Minnesota. RAINTIGER was classified as a "Fruit Import and Export Company".

e.  On January 13, 2020, HAO made a cash deposit into SKYSTELLAR BofA 2155 of $130,000 in Chicago, Illinois (IL). SKYSTELLAR was classified as an "Import Export of Pet Products".

f.  On March 12, 2020, JINDIAN LI ("LI"), DOB April 30, 1998, University of Santa Barbara student, made a cash deposit into RAINTIGER Chase 2631 of $300,000.00 in Elmhurst, IL. RAINTIGER was classified as a "Furniture and Home Furnishing Store".

g.   On March 12, 2020, LI and LIU made a cash deposit into RAINTIGER WF 1061 of $324,310 in Elmhurst, IL and Atlanta, Georgia.  RAINTIGER was classified as a "Furniture Store".

h.   HAO deposited $713,580 cash into RAINTIGER BofA 2171 and deposited $399,915 cash into SKYSTELLAR account BofA 2155.

43.  According to a Drug Enforcement Administration ("DEA")

Report of Investigation I1-20-0127, on November 3, 2020, HAO was
interviewed by DEA Task Force Officer Francis Lacny at 2801 MLK
Drive, Chicago, IL 60616.  HAO stated that he was approached at
a party by a person named JINGDIEN LI.[7]  LI told HAO that he
owned a company called RAINTIGER.  LI asked HAO to make cash
deposits for him into his bank accounts.  HAO made 5-6 cash
deposits for LI, each deposit ranging from $50,000 to $200,000.
HAO received large sums of money from random people.  LI was
"the boss" of this operation and would call HAO to tell him
where to go, who to meet, what to deposit, or who to drop money
too.

44.  According to a HSI Report of Investigation referencing
DEA Report of Investigation Case Number OR09QK20OR0001, on
October 22, 2019, Israeli Customs reported the seizure of 10.2
kilograms of crystal methamphetamine from a cargo shipment at
Ben Gurion Airport.  The contraband was concealed inside a box
of cat play structures.  The shipment was sent via air cargo
from Rotterdam, The Netherlands, through Tel Aviv, Israel, to a
consignee in Irvine, California.  The Consignee was identified
as Starfields Capital Management LLC., EIN # 82-5394033, JINDIAN
LI at the Meander address, telephone number (949) 885-6900.

45.  I located a third company that utilized the Meander
address as the business address.  According to the California
Secretary of State website, bizfileonline.sos.ca.gov, I located
a business identified as FULLSUN BIOTECH INC., that was filed on
March 9, 2020.  The business address listed was the Meander
address and the registered corporate agent's name was KE &
ASSOCIATES.  The form was signed by ZHANG.  As such, I believe
ZHANG has direct ties to an address, specifically the Meander
address, which was used to establish illicit bank accounts.

---

[7] The DEA report spelled JINDIAN LI's name incorrectly.

**H.   ZHANG Receives Zelle Transfers from a Shell Company that Received Victim Funds**

46.   Throughout my investigation, I identified two businesses that I believe are tied to ZHANG and were created for the purpose of laundering victim fraud funds.  Both businesses identify JING XU ("XU") as CFO, were established within two weeks of one another, used the same address, and opened and had their respective bank accounts closed within approximately one month.

47.   On or about February 2, 2023, I accessed the Delaware Secretary of State website[8] and queried records for the businesses named, "MAYNOS INC." ("MAYNOS") and "LALM GROUP INC." ("LALM").  The records showed the following:

a.   MAYNOS was incorporated on December 9, 2020 in Delaware.  MAYNOS' file number is 4393506 and postal code is 95050.[9]

b.   LALM was incorporated on November 25, 2020 in Delaware.  LALM's file number is 4255980 and postal code for registration is 95050.

48.  On or around March 6, 2023, I reviewed the BofA financial statements and records for bank accounts associated with MAYNOS and LALM.  The statements and records showed the following:

a.   MAYNOS BofA account ending 7452 ("BofA 7452") was opened on December 15, 2020, by JING XU, designated as "CFO." BofA 7452 was registered to address 18351 Colima Road, Suite 425, Rowland Heights, California 91748 ("the Colima address").[10]

---

[8] I queried the following website, icis.corp.delaware.gov/ecorp/entitysearch/namesearch.aspx.

[9] The state of Delaware provides limited publicly accessible information on corporations incorporated in the state.

[10] A search of the internet indicates the Colima address is a private mailbox rental facility

BofA 7452 was closed on January 12, 2021, less than one month after it was opened.  A total of $76,481.23 was deposited into BofA 7452.  A total of $76,481.23 was withdrawn from BofA 7452.

b.  On January 8, 2021, MAYNOS BofA 7452 received a transfer deposit from "A.F." of $987.72.  MAYNOS BofA 7452 received similar transfers from 80 additional individual bank accounts from January 4, 2021, to January 8, 2021.

c.  On January 5, 2021 and January 6, 2021, KE & ASSOCIATES received transfers of $670 from MAYNOS BofA 7452. This is the same fee ZHANG charged the UCE to incorporate a business.  I believe these transfers were payments to KE & ASSOCIATES for services related to MAYNOS and LALM and/or opening additional businesses to be used for similar means.

49.  LALM BofA account 0633 ("BofA 0633") was opened on December 8, 2020 by JING XU, designated as "CFO," BofA 0633 was registered to the Colima address.  BofA 0633 was closed on December 23, 2020, less than one month later.  A total of $53,494.58 was deposited and later withdrawn from BofA 0633.

50.  On December 15, 2020, LALM account 0633 received a transfer deposit from "D.T." of $999.  LALM account 0633 received similar transfers from 37 individual's bank accounts from December 9, 2020 to December 21, 2020.

51.  The Internet Crime Center, (herein referred to as "IC3"), a law enforcement internet site to report cyber-crimes, received two victim complaints related to MAYNOS and LALM.  I reviewed the IC3 complaints.  The following is a summary of the information:

a.  A.F., previously identified above, filed a complaint with IC3, identified as I2101081657064001 on January 8, 2021.  On January 8, 2021, A.F received a phone call from someone claiming to be Amazon Prime.  A.F was informed that there was fraudulent activity on their Amazon account.  The

26

individual had A.F download a screen broadcasting application and assisted A.F in transferring a $987.72 Zelle payment to "Maynos Inc." The individual on the phone requested A.F to submit another payment. A.F called Chase Bank and was informed that A.F. was a victim of a scam.

b.   D.T., previously identified above, reported IC3 complaint I2012182047540041 on December 18, 2020. D.T. received an email on December 15, 2020, that appeared to be from Amazon, and informed D.T. of a recent purchase for $5,599.49. D.T. called 1-833-311-1806, the phone number on the email, and was advised to send a $999 Zelle transfer to "Lalm Group." D.T. was then advised to go to the nearest CVS and purchase a $200 Amazon security card. D.T. realized the fraud and reported the incident to IC3.

52.   I believe MAYNOS and LALM are businesses solely created for the purpose of laundering victim funds into their BofA bank accounts. BofA accounts 7452 and 0633 were open and closed within a month of operating. I believe ZHANG was involved in incorporating MAYNOS and LALM. KE & ASSOCIATES received a direct payment from one of the two bank accounts for an amount consistent with ZHANG's fee schedule.

**I.   Businesses Associated with the Corporate Park Mailbox**

53.   During an undercover operation on February 23, 2023, with the UCE, WANG positively identified the Corporate Park mailbox as KE & ASSOCIATES's mailing address. WANG and ZHANG agreed to place the fictitious KDAY Management, Inc. under the Corporate Park mailbox address.

54.   On March 6, 2023, U.S. Postal Inspector Sumyra Duy pulled the Commercial Mail Receiving Agent application for 92 Corporate Park, Suite C204, Irvine, California. This address belongs to a Mailboxes and More. Inspector Duy pulled Form 1583, which is the Application for Delivery of Mail Through

Agent for Box #204.  This form indicates WANG was the applicant
for Box #204.  The application was dated July 2, 2021 and
indicated that WANG provided California DL#Y4369885 as well as
her Chinese passport.  WANG put 25351 Spindlewood, Laguna
Niguel, California 92677 as a home address and KE & ASSOCIATES
as the name of firm or corporation with a business address of
SUBJECT PREMISES 2, telephone number of 702-747-0034.  Although
the form indicated that a US passport was used, WANG's Chinese
passport was attached to the application rather than a US
passport.  The owner of the Mailboxes and More stated that the
C204 receives different businesses' mail at the PO Box. These
businesses are not listed on the application.  Inspector Duy
also confirmed that SUBJECT PREMISES 2 receives lots of Amazon
packages as well as mail from New York State Department of Tax
and Finance and Ohio Department of Taxation, Office of Tax and
Revenue.

       55.  On March 30, 2023, I reviewed public source databases,
Secretary of State records, and FinCen records and learned that
at least 99 corporations have used the Corporate Park mailbox as
their address.  Of those 99 corporations, I identified one
corporation whose bank account was associated with a fraud
complaint.

       56.  On March 30, 2023, I accessed the California Secretary
of State website and queried records for the business name,
People Friendly Household Appliances Ltd.  People Friendly
Household Appliances Ltd.'s Articles of Incorporation were filed
on April 26, 2022.  The Articles of Incorporation list HUAFU
OUYANG as the agent name and the Corporate Park mailbox as the
principal address and mailing address.

       57.  IC3 received an elderly abuse complaint
I2206142041013152 from "R.M." on June 14, 2022.  On June 13,
2022, R.M. sent $300,000 by wire transfer to East West Bank,

Account Name "People Friendly Household Appliance," Account
Number 8618028743, Routing Number 322070381 ("E/W 8743").  R.M.
was on the computer when a message appeared on his computer
screen to not turn off or restart the computer and to call 1-
855-538-2154.  R.M. called 1-855-538-2154 and an unknown
individual stated they were from Microsoft and computers were
being hacked from Russia.  R.M. was then contacted by someone
who identified himself as Brian (Last Name Unknown "LNU") from
the fraud department at Bank of the West.  R.M. was asked if he
had requested a wire transfer of $298,000.  R.M. stated that he
had not.  R.M. was informed that there was an inside scam of
Bank of the West employees regarding Russia.  R.M. was requested
to wire $300,000 out of his bank account so the fraudulent
$298,000 would not be funded out of his account.  The individual
on the phone told R.M. to not say anything to bank employees and
had R.M. stay on the phone while R.M. wired $300,000 to People
Friendly Household Appliance's account, E/W 8743.  On June 14,
2022, R.M. attempted to send a second wire transfer to a
different bank account.  The bank branch manager questioned
R.M.'s reasoning for an additional money transfer.  The bank
branch manager informed R.M. that he was a victim of fraud and
no bank fraud department would do this.

58.  I identified another corporation using the Corporate
Park address where a large shipment of drugs was seized.
According to Custom and Border Patrol Incident 2022SZ0098100, a
package containing 21.920 kilograms of ketamine concealed within
the false bottom of two air handling units were seized by
Customs and Border Protection in Texas on July 29, 2022.  The
package was coming from the Czech Republic on an Air General
Cargo flight, addressed to QCOOL EXPRESS INC. ("QCOOL EXPRESS"),
92 Corporate Park, Suite C 2041, Irvine, California 92606.
According to Postal Inspector Duy, the company "Mailboxes and

29

More" 92 Corporate Park, Suite C 2041, Irvine, California 92606 is not a valid address.  The mailbox does not exist.  I believe the sender misspelled the address and meant to use Corporate Park mailbox, which is suite C 204.

59.  On or about March 30, 2023, I accessed the California Secretary of State website and queried records for the business name, "QCool Express Inc."  QCOOL EXPRESS's Articles of Incorporation was filed on April 18, 2022.  The Corporate Park mailbox is listed as QCOOL EXPRESS' principle office address and mailing address.  KE & ASSOCIATES is listed as QCOOL EXPRESS' registering agent.

60.  I located an additional corporation that utilized the Corporate Park address, where ZHANG is identified as the registered agent.  On or around January 31, 2023, I accessed the California Secretary of State website and queried records for the business name, "BITKEEP GLOBAL INC." ("BITKEEP").  According to the Statement and Designation, BITKEEP is an out of state stock corporation that was initially filed in California on May 3, 2022, but formed in Alabama.  BITKEEP's principal address and mailing address is the Corporate Park mailbox.  According to the Statement of Information filed on August 9, 2022, YUN YAN is listed as CEO and CFO and ZHANG is listed as Secretary.  From public search engines, I learned that BITKEEP is a decentralized multi-chain cryptocurrency wallet.  On or around March 3, 2022, I reviewed BITKEEP's US Bank account ending in 0837 ("USB 0837").  The only account activity was a wire transfer of $56,375 on September 6, 2022 from Fomo Pay PTE LTD, located in Singapore.  A closing check was issued on November 10, 2022 for $56,446 and deposited into a Cathay Bank account.  I know that cryptocurrency, which are accessible on digital devices, can be used for financial transaction purposes to avoid law enforcement access and scrutiny.

**J.   The April 17, 2023 Undercover Operation**

61.  On April 17, 2023, at approximately 3:50 p.m., a Confidential Human Source ("CHS") went to SUBJECT PREMISES 2 and met with ZHANG.  Prior to the meeting, the CHS was shown ZHANG's photograph from the KE & ASSOCIATES website, as well as ZHANG's California Driver's license.  The meeting was audio and video recorded.  From reviewing the video recording, speaking with the CHS with a FBI Linguist present after the meeting, and reviewing the WeChat conversations between ZHANG and CHS, I learned the following:

a.  The CHS entered SUBJECT PREMISES 2 and entered a lobby area where three female employees were working.  The CHS observed employees working on desktop computers.  CHS stated that he/she had made an appointment with "Zhang."  CHS then entered a small room on the right side of the office where ZHANG was located.  CHS attempted to close the door to ZHANG's office, but ZHANG indicated that KE & ASSOCIATES's employees "all know more" and the employees would be fine listening to their conversation.  CHS told ZHANG about his/her relative in China who needed assistance in registering a company in the United States to open a US business bank account and move $3.2 million RMB out of China into that bank account.  The CHS informed ZHANG that he/she was flying back to China the next day and would pay ZHANG for his services in advance.  CHS stated that he/she did not want any of the business or bank documents in his/her name or his/her relatives' name.

b.  ZHANG stated to the CHS that $3.2 million RMB should be easy to move out of China.  Zhang stated $3.2 million RMB was a small amount and made the statement, "why so serious for such a small amount."  ZHANG added the CHS to a group WeChat with KE & ASSOCIATES's employees, ZHANG, WANG, Jennifer LNU, Grace LNU, and unknown WeChat user handle. ZHANG sent the CHS via WeChat a

31

business registration form, pricing structure, different methods
of payments options, and an invoice for $700 for "Company
Formation Service."   ZHANG stated that if CHS has any questions
to use the WeChat group.

      c.  ZHANG illustrated on a white board the process of
how to get RMB out of China and into United States dollars.
Once completed, ZHANG requested the CHS to take a picture of the
white board.   ZHANG could register the business in California,
Delaware, or Ohio.   ZHANG stated that the annual fees for
companies vary per state.   ZHANG recommended Ohio was the best
state to register a shell company since there was no annual
fees.   ZHANG recommended CHS open a bank account through East
West Bank since bank accounts can be opened through video
conferencing without individuals being physically present. CHS
asked if someone else could open up the account for him/her.
ZHANG said there is risk involved in having another person
attached to the bank account because that individual can take
the money out of the account. ZHANG said he would not open the
bank account for CHS.

      d.  ZHANG said that if CHS does not have an address in
the USA, the CHS could use an address next door to SUBJECT
PREMISES 2.   I believe ZHANG was referring to the Corporate Park
mailbox.   ZHANG said CHS could use different financial software
companies to get a couple hundred thousand dollars' worth of RMB
out of China and exchange it into USD.

      e.  ZHANG stated there is another way to get millions
and tens of millions of dollars out of China, which could be
done through East West Bank.   ZHANG said CHS could contact
"Jennifer", an employee in the China Branch of KE & ASSOCIATES,
for the specifics. The CHS indicated to ZHANG that the 3.2
million RMB was just the beginning of how much he/she wanted to
transfer out of China.

   f.   ZHANG told CHS that he is going to Shenzhen, China
in four days to establish a business branch in China.   ZHANG
said the next steps would be to fill out the forms sent through
WeChat and send ZHANG a company name.   Zhang charged CHS $700 to
establish the company.   ZHANG informed the CHS that he/she will
receive instruction from Jennifer LNU.

## K.   Additional Investigation and Surveillance of SUBJECT PREMISES 1 and 2

   62.   On January 30, 2023, an FBI surveillance team
conducted surveillance at SUBJECT PREMISES 1 and observed the
SUBJECT VEHICLE arrive and park in the garage.   ZHANG exited
SUBJECT VEHICLE, removed some personal belongings, including
black luggage from the trunk and entered the SUBJECT PREMISES 1.
At approximately 3:00 p.m., ZHANG departed SUBJECT PREMISES 1
and drove to SUBJECT PREMISES 2.   ZHANG entered the building
with an unknown item in his hand.   At approximately 7:30 p.m.,
ZHANG departed SUBJECT PREMISES 2 and drove to an unknown
residence in Irvine, California.

   63.   On February 7, 2023, at approximately 10:43 a.m.,
ZHANG was observed departing SUBJECT PREMISES 1 in SUBJECT
VEHICLE and drove to his employment at SUBJECT PREMISES 2.

   64.   On February 11, 2023, at approximately 9:38 a.m.,
ZHANG departed SUBJECT PREMISES 1 driving SUBJECT VEHICLE and
arrived at SUBJECT PREMISES 2.   After approximately one hour,
ZHANG exited SUBJECT PREMISES 2 and returned to SUBJECT PREMISES
1.   Shortly after, a black Mercedes-Benz SUV bearing California
license plate 8MXL932 arrived with an unknown male ("UM1"), who
walked to the front door.   At approximately 11:24 a.m., ZHANG
and UM1 departed in the SUBJECT VEHICLE and drove to Cathay
Bank, located at 825 Valley Blvd, San Gabriel, CA.   ZHANG
remained in the vehicle while UM1 got out of the vehicle and

walked towards the bank which appeared to be closed.  UM1 walked
toward the ATM but did not use it and returned to SUBJECT
VEHICLE and departed.  ZHANG and UM1 drove to Cathay Bank,
located at 590 W. Main Street, Alhambra, CA.  ZHANG remined in
the vehicle while UM1 got out and walked toward the bank, then
immediately returned to SUBJECT VEHICLE.  After stopping to get
gas, ZHANG drove UM1 to a BofA ATM, located at 2587 W.
Commonwealth Ave, Alhambra.  UM1 walked up to the ATM building
and returned to the vehicle while counting cash.  They sat in
the SUBJECT VEHICLE for a few minutes and then drove to an
unidentified residence in the vicinity of 227 New Ave, Monterey
Park, California.

     65.  I conducted Google map searches and determined ZHANG
drove from SUBJECT RESIDENCE 1 approximately 41 miles to go to
the first Cathay Bank in San Gabriel, CA, passing at least eight
Cathay bank branches.  He then drove three miles to the next
Cathay bank, which I believe would be the next closest bank.  He
drove approximately 1.4 miles to the BofA ATM.  Learning that
UM1 used a different bank ATM, I know that from the beginning of
their trip, they passed numerous ATMs before arriving at the
BofA ATM.  From there, they drove approximately five miles to
arrive at an unknown residence.   I know that people engaged in
illegal activity often utilize business locations that are not
close to locations associated with them to evade law enforcement
detection.

     66.  On March 23, 2023, FBI surveillance observed ZHANG
depart SUBJECT PREMISES 1 in the SUBJECT VEHICLE.  ZHANG
proceeded to drive directly to Citibank located at 3996 Barranca
Pkwy, Irvine, CA, 92606.  ZHANG was in the Citibank for just
under an hour.  ZHANG left Citibank alone and drove directly to
SUBJECT PREMISES 2.  I learned from a bank investigator that on

March 23, 2023, ZHANG opened a business account for KE & ASSOCIATES CONSULTING INC.

67.   On April 1, 2023, FBI surveillance learned through an internet search that SUBJECT PREMISES 1 was available for rent. U.S. Postal Inspector Duy and HSI SA Josh Ching made contact with the listing agent identified on "Zillow" and made arrangements to view the residence.  On April 7, 2023, at approximately 12:00 p.m., Inspector Duy and SA Ching met with a family member who owned the house and toured SUBJECT PREMISE 1. The family member identified himself as "Antonio" ("Antonio"). Antonio stated his father owned the SUBJECT PREMISES 1 and SUBJECT PREMISES 1 is the house where Antonio grew up.  Antonio said that the house was occupied by one man, and he was departing for China at the end of the month.  I believe Antonio was referring to ZHANG.  The investigators observed SUBJECT PREMISES 1 had general items inside the home that indicated someone was still living there, such as kitchen goods, food, toiletries, and clothing hanging in the closet.  Inspectors observed a framed photograph of a man carrying a young child on the fireplace mantle, who they believe is ZHANG. U.S. Postal Inspector Duy observed a desk with a computer monitor inside the garage in SUBJECT PREMISES 1.

68.   On April 5, 2023, the Honorable Karen Scott signed federal search warrant number 8:23-MJ-00200, authorizing a GPS cellular ping order for ZHANG's telephone, identified as 702-626-4688.  Additionally, the Honorable Karen Scott signed federal search warrant number 8:23-MJ-00201 authorizing agents to install a GPS tracking device for SUBJECT VEHICLE.  Since April 5, 2023, FBI surveillance observed ZHANG in the same location as his cellular telephone GPS data, and where his SUBJECT VEHICLE was observed, which includes at or near SUBJECT PREMISES 1 and 2.  Additionally, as of April 19, 2023, at

11:00 a.m., the GPS phone ping placed ZHANG in an area near SUBJECT PREMISES 1, within 4448 meters of uncertainty.  The vehicle tracker placed SUBJECT VEHICLE at SUBJECT PREMISES 1. At approximately 12:21 p.m., the vehicle tracker and phone ping was located at or near SUBJECT PREMISES 2.  Based upon physical surveillance, vehicle tracker data, and cell phone GPS pings, I believe ZHANG still resides at SUBJECT PREMISES  1 and works at SUBJECT PREMISES 2 as of April 19, 2023.

68.     On April 11, 2023, FBI surveillance saw ZHANG leave SUBJECT PREMISES 1 driving the SUBJECT VEHICLE, arriving at SUBJECT PREMISES 2.  Based on the results of surveillance of SUBJECT PREMISES 1 and 2, I believe ZHANG resides at SUBJECT PREMISES 1 and works at SUBJECT PREMISES 2.

### V.  TRAINING AND EXPERIENCE ON FINANCIAL CRIME CASES

70.     Based on my training and experience, as well as the training and experience of other agents whom I have consulted with regarding this investigation, I know that criminals who commit financial and other fraud-type offenses often bring books, records, computers, phones, or other information pertaining to their fraudulent schemes in their vehicles and to their residences. These items are often carried when traveling between their homes, where they often have home offices, their business offices, or banks.  Thus, I believe it is likely that ZHANG and WANG will have information related to their money laundering scheme within their vehicles and/or home office.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL CURRENCY

71.     Individuals involved in digital currency, including those who launder funds by using digital currency, use a variety of digital devices, such as phones and computers.  These individuals also use multiple digital devices in order to

maintain anonymity and to compartmentalize communication, or use encrypted forms of communication in speaking with criminal associates.  Additionally, those who use digital currency may store their "recovery seed" or "private keys" on digital devices.  This also includes personal digital devices that the individual carries on their person.  I know that the UCE and witnesses involved in the investigation have communicated with ZHANG and WANG using digital devices.  Additionally, accessing digital currency can occur by USB or flash-drive device.  Based on my training and experience, individuals who have such valuable information store this information separate and away from their routine operations such that it is safe from theft and/or law enforcement and compartmentalized.   In this investigation, given that the UCE and other witnesses have met with ZHANG at SUBJECT PREMISES 2, I believe that SUBJECT PREMISES 1 offers a safe, compartmentalized space for ZHANG to store evidence of his illegal activity, including digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[11]

72.   Based on my training and experience, as well as my knowledge of this investigation, I believe that there is probable cause to believe that ZHANG and/or WANG are using computers and/or storage media to commit the violations described above. As described above, the UCE has communicated with ZHANG and WANG using telephones.  The UCE received emails

---

[11] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyBank of Americacards; printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

with attachments which were likely sent to the UCE using a computer device.  Additionally, witnesses have stated that ZHANG and/or WANG use their telephones and computers to communicate with their clients who are overseas. For this reason, I believe that there are electronic devices currently located at SUBJECT PREMISES 1 and 2.

73.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

74.   Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

a.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are

38

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

b.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

c. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

75.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult

39

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

76.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress ZHANG's and/or WANG's thumbs and/or
fingers on the device(s); and (2) hold the device(s) in front of
ZHANG's and/or WANG's faces with his or her eyes open to
activate the facial-, iris-, and/or retina-recognition feature.
Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

/ / /

/ / /

/ / /

## VIII. CONCLUSION

77.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at SUBJECT PREMISES 1 and 2, the SUBJECT VEHICLE, and on the persons of ZHANG and WANG, as described in Attachments A-1, A-2, A-3, A-4, and A-5.


Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone
on this ____ day of
April, 2023.


_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

<u>**SUBJECT PREMISES 1**</u>

20 Robins Tree Lane, Irvine, California 92602 is further described as a two-story single family dwelling.  It is beige in color with a grey, two-car garage door and dark green front door facing the street.  The number "20" is posted on the top of the left column.



**ATTACHMENT A-2**

**SUBJECT PREMISES 2**

KE & ASSOCIATES CONSULTING INC. is located at 10 Corporate Park, Suite 330, Irvine, California 92606.  The business is located inside a three story business complex.  The number "10" is displayed on two brick columns located at the parking lot entrances. The SUBJECT PREMISES 2 is located on the 3rd floor toward the back of the building complex, and is an office suite with multiple cubicles, a conference table to the left as you enter, and a separate private office located to the right as you enter; all contained inside SUBJECT PREMISES 2.  The suite number "330" is listed on the left side of the entry door.



**ATTACHMENT A-3**

**SUBJECT VEHICLE 1**

The vehicle is a 2019 white Mercedes-Benz, GLS 450 with a roof rack, California License Plate 8NCU620 with Vehicle Identification Number ("VIN") 4JGDF6EE9KB225382.  The registered owner of the vehicle is "KE AND ASSOCIATES, CONSULTING INC, OR ZHANG KE," with an address of "10 CORPORATE PARK STE 330, IRVINE, CA 92606."

**ATTACHMENT A-4**

KE ZHANG is an Asian male with a DOB of December 11, 1974 and
Social Security Number 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.  ZHANG's California Driver's
license is F5768994.



**ATTACHMENT A-5**

YANMING WANG is an Asian female with DOB July 11, 1997 and
Social Security Number 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.  WANG has a California
driver's license (Y4369885).  According to DMV information, she
has black hair, brown eyes, is 5'5" tall and weighs 100 lbs.



47

**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband,
fruits, and/or instrumentalities of violations of 18 U.S.C.
§ 1344 (Bank Fraud); 18 U.S.C. § 1343 (Wire Fraud); and 18
U.S.C. § 1956 (Money Laundering) (collectively, the "SUBJECT
OFFENSES"), such violations occurring from the period from March
2018 to the present, namely:

        a.    Payroll and personnel records, receipts, IRS
Forms W-2, IRS Forms 1099, State and Federal Tax Returns from
2019 through the present.

        b.    Records and materials concerning Articles of
Incorporation and/or Employer Identification Numbers or Taxpayer
Identification Numbers from 2019 through the present.

        c.    Copies of and actual driver licenses, state
identification cards, passports, and other forms of
identification, to include Social Security cards.

        d.    Records containing client files, telephone
directories, phone logs, appointment books, calendars, diaries,
notes, address books, and memoranda concerning KE & ASSOCIATES,
limited to an aggregate of 100 items in this category.

        e.    Bank records or records received from financial
institutions, including debit cards; correspondence regarding
debit card accounts; wire transfer records; bank statements and
associated transactional records; money drafts; letters of
credit; safety deposit box keys and records; checkbooks; money
wrappers; money containers; income tax records; payroll records;
credit cards; and any other records of financial transactions
that reflect the disposition and/or allocation of monies from
_____.

        f.    Records of any accounts or transactions via

cryptocurrencies such as bitcoin from 2019 through 2023.

g.   Digital currency, such as bitcoin, cryptocurrency (or digital currency) private keys, and digital currency recovery seeds.

h.   Records reflecting the creation of businesses and bank accounts.

i.   Records reflecting the use of proceeds from the creation of businesses and bank accounts, and relating to the acquisition, secreting, transfer, concealment, of money.

j.   Records relating to any travel to China.

k.   Contents of any calendar or date book stored on any of the digital devices.

l.   All documents, chats, or texts referring to or with bank employees.

m.   Global Positioning System coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

n.   Records and materials evidencing occupancy, residency, control, and/or ownership of SUBJECT PREMISES 1 and 2 and SUBJECT VEHICLE identified in Attachments A-1, A-2, and A-3, including utility bills, cable bills, property tax bills, notices, lease agreements, mortgage bills, titles, and registration cards, limited to 5 items.

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

p.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

accessed through any push-to-talk functions, as well as all received or missed incoming calls.

q.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the SUBJECT OFFENSES.

r.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, WeChat, QQ, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the creation of bank accounts and businesses and money transfers.

s.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

t.   Records relating to the opening and use of post office boxes and mail boxes.

u.   United States currency in excess of $2,000, including the first $2,000 if more than $2,000 is seized, digital currency such as Bitcoin stored on electronic wallets or other forms of wallets or other means, cryptocurrency private keys and recovery seed, and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, antique or modern automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of fraud and money laundering.

   v. Documents related to storage units and containers, as well as storage units and containers, such as floor safes, wall safes, upright safes, lock boxes, and other self-contained locked enclosures.

 2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

   a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment of other devices;

   d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   e. evidence of the times the device was used;

   f. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

   g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   h. records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyBank of Americards, printers, scanners,
plotters, monitors, and drives intended for removable media;
related communications devices, such as modems, routers, cables,
and connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

3.   With respect to any cryptocurrencies to be seized, such
as bitcoin, cryptocurrency private keys and recovery seeds (as
described above in paragraph 1(g)), the cryptocurrency (or
digital currency), cryptocurrency (or digital currency) private
keys, and recovery seeds to be seized is evidence, contraband,
involved in or traceable to violations of 18 U.S.C. § 1956

(Money Laundering).  Seizure of any cryptocurrency/digital currency private keys and recovery seeds shall also be construed to include seizure of any cryptocurrency related to any such seized private keys and/or recovery seeds, and such seizure shall allow transfer of any such related cryptocurrency to one or more government-controlled accounts, or "wallets."

**II. SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

53

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

54

able to fully search a device because the device or files contained therein is/are encrypted.

    h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

   6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

    a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

    b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

    c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

    d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

    e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device. During the execution of this search warrant, law enforcement is permitted to: (1) depress ZHANG and/or WANG's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of ZHANG and/or WANG's faces with his or her eyes open to activate the facial-, iris-, or retina recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

h.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.